EDDIE ROGERS *v.* STATE OF ARKANSAS

5525

458 S. W. 2d 747

Opinion delivered October 12, 1970
[Rehearing denied November 16, 1970.]

118

*George Howard, Jr.,* for appellant.

*Joe Purcell,* Attorney General; *Milton Lueken,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Eddie Rogers, was convicted of the crime of first degree rape, the jury fixing his punishment at confinement in the Department of Correction for fifty-five years. From such conviction, appellant brings this appeal. For reversal, six separate points are asserted which we proceed to discuss in the order listed.

It is first contended that the evidence was insufficient to support the verdict of the jury. Appellant's defense is predicated on the contention that intercourse with the prosecuting witness was by consent; in fact, appellant testified that he had had sexual relations with the prosecutrix on three other occasions. The alleged victim said that she retired about 10 P.M., her husband being away. Her one year old child was in the bed with her and three other children were in another bed in the same room. About 3:30 A.M. she was awakened by a man standing by the bed, who said, "Be quiet and I won't have to hurt you". She testified that he kissed her on the lips "pretty hard", bruising her lips, had intercourse with her, and then left. The witness said that she did not know her attacker. Admittedly, she did not cry out for help, and appellant argues that there was no force employed, and thus no rape; that there was a duty on the part of the alleged victim to resist the attack, and that the evidence was that this was not done. We do not agree with appellant in his interpretation of the applicable law. The prosecutrix testified that she did not make an outcry because she was "afraid to", and was fearful that her assailant might hurt the children if they were awakened; that except for fear of the children's safety, she would have endeavored to fight him.

This being true, rape was committed. We have said that if a woman assaulted failed to resist or to

make outcry because she feared for her safety, the crime was against her will and would constitute rape. *Threet v. State* 110 Ark. 152, 161 S. W. 139, *Hamm v. State* 214 Ark. 171, 214 S. W. 2d 917.

Dr. Owen Griffin Blackwell testified that he examined the prosecuting witness several hours after the alleged occurrence, found sperm in the vagina, and swelling of the hymeneal ring, the latter condition not usually occurring after normal sex relations. He stated that penetration had taken place. Deputy Sheriff Earl May testified that when he went to the home of the prosecuting witness, he found her upper lip swollen, "swelled up and blue", and Deputy Sheriff Mickey Adkinson, also present, testified that the prosecutrix was crying and "her lips seemed like they were busted". As previously stated, appellant admitted the act of intercourse, but testified that it was by consent. The question of who was telling the truth was, of course, a jury question, and it was resolved against Rogers. The evidence was sufficient to sustain the conviction.

The next two points deal with the action of Officer May in taking articles of clothing and a bottle of powder from the home of appellant. Appellant says that these articles were inadmissible in evidence for the reason that Rogers was not under arrest at the time they were taken. According to the testimony of May, Rogers voluntarily gave him the clothing after a request for same had been made, and the powder was turned over voluntarily by the wife of appellant. May further testified that before obtaining any of this personal property, Rogers was advised of his constitutional rights, the officer reading to him from a card the warnings required to be given a suspect before interrogation, as set out in the case of *Miranda v. Arizona* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. There is no necessity to discuss whether the taking of the clothing and powder required a search warrant, for the admission of this testimony could not possibly have been prejudicial. Let it again be pointed out that there was no denial of the act of intercourse—only that the

act was committed by force. There was nothing about the clothing nor the powder that added weight to the state's argument that force had been used. It follows that there is no merit in this contention.

It is next asserted that appellant was deprived of his constitutional rights by failure of the officers to advise him of the rights under *Miranda*, mentioned in the preceding paragraph. This point is predicated on the fact that the "Miranda warning" card was not introduced into evidence, nor was the content read into the record to determine whether the card actually contained the necessary warnings. Mr. May testified that he did read a card containing these warnings to appellant; that he kept such a card with him at all times; that the card was either the same one that the witness produced at the trial, or was one just like it. Of course, defense counsel had the opportunity to examine the card which May was referring to during his testimony[1]. The deputy answered to specific questions that appellant was told that he had a right to remain silent, that he had a right to talk to a lawyer, and that anything said by appellant could be used against him. Deputy Sheriff Adkinson's testimony corroborated that of May. Rogers denied that he was advised of his constitutional rights.

Here again we have a conflict of the evidence, and it was a function of the jury to determine which witness was telling the truth. However, even if it were established that the warnings were not given, we see no prejudice, for Rogers maintained that intercourse had been by consent, and he made no admission to the officers that would indicate to the contrary.

It is contended that the court erred in permitting the witness to be asked the question "Did he tell you he would hurt you if you didn't cooperate?" The assertion of error is based on the allegation that this was

---

[1] Whether this was actually done is not shown in the record. However, defense counsel, at the trial, stated: "Although the defendant was advised of his rights, I don't think it has been established he was afforded those rights".

a leading question. Assuming, without deciding, that the argument is correct, there would still be no error for, though the objection to the question was overruled, the question was never answered; instead, the prosecuting attorney asked another question.

Finally, it is argued that there was an unconstitutional selection of the list of prospective jurors which included the petit jury that tried the appellant.

Let it first be stated that there was no challenge to the jury panel until after Rogers had been found guilty. The proof offered in support of this allegation was submitted during a hearing on a motion for a new trial held approximately two weeks after the verdict of guilty had been rendered.[2] The state suggests that the challenge to the panel came too late. It was so held in the federal case of *Frazier* v. *United States*, 69 S. Ct. 201, 335 U. S. 497, 93 L. Ed. 187. There, an attack was made upon a panel of prospective jurors during the course of *voir dire* examination, defendant being charged with violation of the Federal Narcotics Act, and it being contended that he had been denied trial by an impartial jury because the jury was composed of government employees; that one of the jurors, and the wife of another, were employed in the Treasury Department (though outside the Narcotics Bureau), the agency charged by law with enforcing the act. The contention was rejected in an opinion by Justice Rutledge, the decision resting on the ground that the challenge was not timely made.

Be that as it may, we prefer to rest our decision upon the basis that no discrimination was shown. What are the facts relied upon by appellant to establish discrimination? First, it appears from the figures, deduced by appellant from evidence offered, that the population of the Arkansas City District is approximately

---

[2]Present counsel for appellant did not represent Rogers at the original trial, but did represent him at the hearing on the motion for new trial.

53% Negro and 47% white.[3] The petit jury list for the term for which appellant was tried reflects that thirty-eight persons were selected to the panel, thirty members of the white race, and eight members of the Negro race. This certainly does not establish discrimination, and really, is hardly a pertinent factor since, in Arkansas, only electors are eligible to serve on a petit jury. One becomes an elector by registering to vote. Proof reflects that there are 4,210 registered voters in the Arkansas City District, but the voter list does not show how many of these are white and how many are Negro.[4] The only proof offered by appellant on this point was by the President of the Dumas Chapter of the NAACP, and also President of the Citizens Improvement Club. He stated that these organizations sponsor and encourage voter registration. The witness said that the activities of his organizations were not confined to any particular racial group; that effort was made to get all people who had not previously registered to do so. When asked how many Negroes had been encouraged to register, Simpkins replied, "I haven't got an accurate account but I should say it would be close to one thousand, we have got close to a thousand". Of course, the witness does not say that approximately one thousand were registered; he only says that many persons were *encouraged* to register. At any rate, it is readily apparent that this testimony does not establish discrimination. It was held in *Cassell* v. *Texas*, 339 U. S. 282, that a jury is not required to have proportional representation of races in order to assure equal protection of the law. In fact, it was held that proportional racial

---

[3]Appellant uses the figures 3,358 whites and 3,848 Negroes "who are eligible for jury duty assuming they meet other legitimate criteria". Desha County is composed of two separate districts, one county seat being located at McGehee, and the other at Arkansas City.

[4]Formerly, the voter list designated the race of each elector, but this practice was discontinued with the passage of the Voter Registration act (Amendment 51 to the Arkansas Constitution). The designation of race had been commented on unfavorably by the United States Supreme Court which stated in *Avery* v. *Georgia*, 345 U. S. 559, "Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate".

limitation, as such, is forbidden. In *Cassell,* jury commissioners in Dallas stated that the reason they did not select Negroes for the grand jury list was because they did not know any who were qualified, and it was also shown that the commissioner had consistently limited the selection of Negroes to not more than one on each grand jury. The United States Supreme Court reversed the case because of discrimination.

In the case before us, it appears that every effort was made to insure proper racial representation on the jury panel. Under the provisions of Section 39-201 Ark. Stat. Ann. (1969 Supp.), the circuit judge appointed seven jury commissioners to select prospective jurors from among the voters of the Arkansas City District. Five of these commissioners were white persons, and two were Negroes. These two Negro members, according to their testimony, assisted in selecting the panel personnel. In what better way can qualified Negro jurors be ascertained, or selected, than by naming members of that race as jury commissioners? One of the Negro commissioners, a school principal, testified that he had lived in the district for thirty-five years. Though the precise question was not asked, it appears that the other, a farmer, had lived in the district for about forty years. Certainly these men were due to have a wide acquaintance among the members of their race. The evidence of four commissioners was to the effect that no one was excluded because of race, color, or creed; the rest were not asked this specific question but all testified that they endeavored to obtain a representative cross section of the community.

In questioning the composition of the panel, it is pointed out that the average age of the persons listed on the petit jury panel list for the term for which appellant was tried, was age fifty, and it is contended that there was a systematic exclusion of young people from this panel. In the first place, we might make the same comment that was made when a similar argument was presented in the case of *Trotter* and *Harris* v. *State,* 237 Ark. 820, 377 S. W. 2d 14. There, we said:

"Finally, appellants mention that several who have served as jurors were 65 years of age or over. We know of no case which holds that elderly people, merely because of their age, are disqualified from jury service. Under Arkansas law, Ark. Stat. Ann. § 39-104, (Repl. 1962), persons 65 years of age cannot be compelled to serve on a grand or petit jury, and the court is authorized to excuse those who may be selected for jury service who are over 60 years of age, but there is certainly no evidence in this record that any juror was compelled to serve. It is entirely logical that the commissioners would be more acquainted with the qualifications of elderly or middle aged Negroes, since these men would have had more opportunity to establish themselves in the community."

Of course, persons 50 years of age are certainly not generally considered "old", and it is interesting to note that this average age among the thirty-eight members of the panel was greatly influenced by the fact that two members of the panel were respectively, 74, and 78 years of age. Nine members were under 40, eight were between 40 and 50, so that nearly half were below the average herein mentioned. It is evident that there was no "systematic exclusion" of young persons, and, for that matter, the age of appellant is never shown in the record, and we have no idea of the age group to which he belongs. The record only reflects that he had a wife and five children.

It is then asserted that there was discrimination based on economic standing. However, the only evidence offered concerns the seven jury commissioners, appellant characterizing six of the seven as "self employed farmers with extensive land holdings". One was a school teacher. Appellant overlooks the fact that one commissioner was an automobile dealer, but it seems only natural that the commissioners selected, would, in the main, be farmers, since there is only one town of any size in the Arkansas City District, the town of Dumas. At any rate, the attack is made upon the *Jury Panel,* and there is nothing in the record which re-

flects the vocation, occupation, or economic status of any member of that panel. We have no knowledge of whether they were farmers, school teachers, office workers, or common laborers. For that matter, it was pointed out in *Thiel* v. *Southern Pacific Company*, 238 U. S. 217, 66 S. Ct. 984, 90 L. Ed. 1181, that it is not necessary that every jury contain representatives of all the economic, social, religious, racial, political and geographical groups of the community. Rather, the requirement is that respective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. It follows that there is no merit in this contention.

Finally, it is alleged that a "quota system" was used by the commission in selecting jurors, and such procedure (says appellant) is violative of the due process clause of the Fourteenth Amendment.[5] This argument is based on the contention that the district was divided into townships and the commissioners made their selections from these various townships on a basis of population percentage. We do not agree that the record factually supports this allegation. Commissioner Peterson, whose testimony is relied upon by appellant, though first using the expression "percentage" subsequently stated that he had made a mistake in using that word and that the commissioners had decided to endeavor to approximately divide the jurors in accordance with the number of eligible voters that lived in a particular township; for example, that since Dumas was the largest town in the district, and there were a larger number of eligible persons in that locality, more people should be selected from Dumas than some smaller township. A reading of the testimony of this witness is rather convincing that the commissioners were earnestly trying to obtain a cross section from the district, this action being in compliance with the oath that they

[5]From appellant's brief: "Appellant respectfully submits not only does this procedure do violence to the Arkansas law and the due process clause of the Fourteenth Amendment to the United States Constitution, but denies equal protection of the law to this appellant and every other person within the Arkansas City District who was not selected for jury duty."

would "select jurors from a fair cross section of the community which this Court serves and you will not exclude or include any persons on account of race, color, religion, sex, national origin or economic status* * *".

The contention is a bit unusual, since ordinarily the complaint relating to the geographical composition of a jury refers to members of a panel being picked from a particular and selected area, rather than from the entire district.

As set out herein, we find no prejudicial or reversible error in the record, and the judgment of the Desha County Circuit Court is accordingly affirmed.

It is so ordered.